IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 16, 2019 Session

## LARRY MARK MANGUM v. LANEY CELESTE MANGUM

Appeal from the Chancery Court for Hamblen County
No. 2016-CV-323      Douglas T. Jenkins, Chancellor



No. E2018-00024-COA-R3-CV

In this appeal, the wife challenges the trial court's designation of the husband as the primary residential parent of the minor children, the crafting of the parenting plan, and the marital property determinations. The trial court neglected to make findings under the appropriate statutory provisions. We vacate the judgment except as to the divorce and remand with instructions to make findings of fact and conclusions of law that consider all the relevant and applicable statutory factors.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated;
Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, C.J. joined.

C. Scott Taylor and Margo J. Maxwell, Knoxville, Tennessee, and Wayne R. Stambaugh, Morristown, Tennessee, for the appellant, Laney Celeste Mangum.

Douglas R. Beier, Morristown, Tennessee, for the appellee, Larry Mark Mangum.

Cynthia A. Cheatham, Nashville, Tennessee, and Sylvia O. Tsakos, Washington, D.C., Amici Curiae.

### OPINION

### I. BACKGROUND

This divorce involves a tumultuous marriage of six years between professional parents who both worked full-time. The couple have two young sons (ages 4 and 6 at the time of the trial).

When the parties began their relationship, Laney Celeste Mangum ("Wife") was 30 years old and a pharmacist. Larry Mark Mangum ("Husband") was 55 years old and the sole owner of

an established veterinary practice in Hamblen County. Husband also owned several farms with cattle and livestock. Additionally, he owned real property and various assets related to his cattle business. Husband's gross income for 2016 was $366,209; Wife's income for the same year was $134,063.

In June 2010, before the couple married, Wife discovered that she was pregnant. The parties' first child, Samuel, was born on January 29, 2011. In order that Wife could continue working as a pharmacist after the birth of her son, her mother retired from her job to become a full-time caretaker for the child. In December of that year, just before Samuel's birth, Husband purchased a farmhouse and acreage at 1735 Needmore Road, Whitesburg, Tennessee ("the Needmore Road property"). The Needmore Road property was purchased by Husband as sole owner, although Wife notes that it was refinanced with both Husband's and Wife's financial information. While waiting on remodeling of the farmhouse, the parties and Samuel lived in a property owned by Wife's parents at 1816 Leia Drive in Morristown ("the Leia Drive property").

The parties were married on November 26, 2011. This was the first marriage for Wife and the second marriage for Husband. Less than a year later, on August 6, 2012, Husband was found guilty in federal district court of the felony of structuring funds to avoid filling out a currency transaction report. He was ordered to serve five years on probation, perform 350 hours of community service, pay a $50,000 fine, and serve two 30-day periods of intermittent confinement. The following year, the parties' second child, John Mark, was born on April 26, 2013.

The parties separated on July 1, 2016. Wife filed for an order of protection, and she and the children moved back into the Leia Drive property. Six days later, Husband filed a complaint for divorce, requesting that he be designated primary residential parent with equal co-parenting time on a four/three day split. The trial was held on October 5-6, 2017.

Counselor, Nan Buturff, a licensed clinical social worker, testified at trial that she had met with the children and observed their aggressive behavior toward Wife. She discussed the differing disciplinary styles of the parents and the Mother's use of time out versus Father's corporal discipline. Ms. Buturff related that she does not believe in corporal punishment; in her view, it is ineffective, does not teach respect, and it only humiliates and angers a child. Ms. Buturff opined that "corporal punishment needs to be a thing of the past" in regard to these children. She admitted that she was unaware of Wife's psychiatric history, if any.

Husband testified that Wife worked all the time, stayed in bed when she was home, and did not help much with the children. According to Husband, he hired maids, cooks, and caretakers to help him attend to the boys. He stated that he spends his mornings with the children and takes them with him to the clinic. Husband further related that he had raised his two older children from his first marriage in the same environment. He noted that one of them is a veterinarian and the other is a teacher.

Husband opined that Wife's parents were a big problem in the marriage, always wanting to take control of the children. He observed that Wife loves her sons but cannot take care of

them. Rather, Wife relinquishes the care of the children to her parents and her friend, Lauren Rice.

As to discipline, Husband testified that he would spank the children if they needed it, but because his sons were aware of that fact, he has never had a problem with them. He claimed to have never "switched" the boys. According to Husband, his sons have "a problem sometimes with focus. If I tell them to do something, they do it, if I tell them not to do something, they don't do it." Husband testified regarding his normal daily routine with the children, observing that he fixed them breakfast, took them to the farm, and to the library and other activities. He related that he often fed them dinner and prepared them for bed.

Husband expressed his belief that it is important to raise the children in a Christian environment, and he preferred that the children get Christian counseling if they needed any therapy. He disagreed with Ms. Buturff about the proper ways to discipline children, and he observed that Wife turned every little scratch, bump, or bruise on the boys into an allegation of abuse or neglect.

Husband's three sisters, Karen Rochelle, Kathy Angle, and Rebecca Mason, all opined that Husband "is a very good father." They observed that the boys behave with their father and respect his discipline. They recalled that Wife made statements to them that she is not able to take care of the boys without help, that she would rather be at work than taking care of the children, and that she cannot handle them alone.

Lara Miller, Husband's veterinary office manager for 15 years, testified that the children come to the clinic with Husband, enjoy being there, and are well behaved when they visit. Ms. Miller opined that Husband is "a very good dad" and a "very good boss." She stated that Wife had commented in front of the boys that she did not want to be a mother and did not know why people wanted to be with their kids. According to Ms. Miller, the comment brought near tears to the eyes of Samuel. She further related that Wife had on numerous occasions stated that she was having problems with the children and could not handle them. Ms. Miller noted that on one occasion, Wife, very upset, related that she was tired of being a mother, that she did not want to be around her boys, and that she did not know why people wanted to stay home on their day off to be with children. On other occasions, she came to the clinic and would go into the lounge, slam the door, and state that she was tired and did not want to be a mother anymore.

Husband has two adult daughters from his first marriage. One of them, Leann Evans, testified that she frequently saw her father with the two boys. She observed that the children respect Husband and noted that they run up to him, grab him, hug him around the neck, and grin from ear to ear. She related that the boys are very well-behaved with Husband, who is a "very good father" to his sons. She recalled that she was close to Wife before the separation and that Wife would confide to her that she was very stressed by being a mother. According to Ms. Evans, Wife stated, "She'd rather be at work twenty…twenty-four hours a day, seven days a week…than to be home with her boys, that she did not know how I could do it. She could never do it." Ms. Evans also observed that she rarely saw Wife caring for the children and that Wife usually was in bed until twelve or one o'clock on the days Ms. Evans was there. Husband would be the one to make breakfast for the children, get them dressed, and get them going.

3

Wife testified that the children were often aggressive, violent, and out of control when they were with her. In addition, Wife alleged domestic abuse. According to Wife, Husband hit her in October 2015 and January 2016. As to the October 2015 incident, Wife recalled that the couple had a disagreement about a woman moving into one of Husband's properties:

A. . . . I didn't actually punch a Capri Sun on his head but I did squirt it towards the bed. It might have got in his eye but I never touched him. And I went into the bathroom and I don't remember how it all happened, if he was in the shower afterwards or before it but it was just like just the things that he was saying to me and the way that he talked to me and . . . I was sitting down in my chair with my makeup vanity open and there's . . . a little pull-out drawer beside of me and … (witness paused) … he came up to me and his hand was flat and it … he pushed me out like that right there.

Q. You need to describe it for the Court Reporter and it's not being videotaped. How and where he hit you?

A. Like on my neck, with open flat hand.

Q. What side?

A. Oh gosh . . . (witness paused) . . . so I was sitting over like that way and so he would have hit me on this side.

Q. So would that be your right side or your left side?

A. My left side.

Q. Alright. Then what happened after that?

A. (Witness paused) I fell to the floor. (Witness paused) And I remember laying there and he came over there and sit over top of me and said "I never did this to you before because I respected your father. But this is my house and I'll do what I want to."

Q. Did that scare you?

A. Yes.

Regarding the January 2016 incident, Wife testified as follows:

A. We had went to church at First Baptist and left. We had the boys with us and we were driving…I was driving my parents' car.

4

. . . I think that Larry had asked if the boys wanted to go to Taco Bell and Samuel said he wanted chicken.  And so we went over to KFC and got in line in the drive-thru and we ordered . . . .  Larry had left his truck at the clinic that morning and . . . we were going to go back by the clinic and he was going to go to work and I was going to go to his parents' house with the boys.  And we got up there to pay for the chicken and I didn't have my purse because . . . my purse was in the trunk with my phone.  And he. . . I asked him for some money.  And he said, "No.  You have all the money.  You can pay for it."  And I just looked at the lady in the drive-thru and said, "Well we'll be back."  And I pulled out on the road and took off towards the clinic and I remember I didn't say one…not one single word.  I've got a habit of … (witness paused)…I just don't say anything.  And on the way from the mall going down towards the clinic I just remember thinking to myself "this is what my kids are going to remember, him talking to me like this."

Q.  And they were in the car when all this happened?

A.  Yes.

Q.  Okay.  And so what did you do next?

A.  And we got to the clinic and parked …we pulled in and he goes to get out of the car and as he goes … I had locked the doors and he opened the door, went in through the door to open it up or went to grab John Mark's door and at that time his door was still open and . . . I was putting the car in reverse and he jumps on…grabs a hold of the doorframe, like where the window is and swings back into the car and hit me.

Q.  Hit you how?

A.  Like swung over with his arm.

Q.  Did he black your eye?

A.  No.

Q.  What did he do to your lip?

A.  It was busted.

Q.  Okay.  Did you run over his foot?

A.  No.

5

Q. Do you remember running over anything?

A. No.

Husband responded that he did not abuse Wife and that the pictures she introduced showing bruises on her thigh and arm occurred in a 2015 fall. According to Husband, Wife squirted a drink in his face as he was lying in bed asleep, smacked him on the head with the carton, and then threw a porcelain platter at him. He claimed that when he jumped up, Wife ran into the bedroom, tripping over a chair and hitting the vanity table with her side. Husband asserted that he did not touch Wife. Three or four days later, when he saw her taking pictures of her bruises, he asked her, "Are you insinuating that I put those on you?" She replied, "Well, you made me do it." Husband testified further:

A. She told me that she had problems in the very first incident when she threw the Kool-Aid on me. She said, "I'm sorry. Please forgive me . . . I'm . . . I'm crazy. This is the way I am." And I said, "No, you're not crazy. . . ." And she said, "No, really, I'm certifiable." I said, "What are you talking about?" And she said, "I see a psychiatrist." And she said…she says, "I have problems with depression." And then she says, "I could really kill somebody and get by with it . . . ." Well as time went on she continued to tell me the very same thing, that she had mental conditions, that she suffered from depression, and that she had suicidal tendencies, that she had thought about killing herself. I said, "Hey you don't need to be doing that." I said, "If you are then you need to be on some medications." Something along those lines. So there was other times that she would come back in though and she kept apologizing after the incident. For example, the next time that she had . . . started on me, I put my hands up like this. Well she grabbed my fingers and . . . cause she was beating me over the head and she bent my fingers back. And there again, I never laid a hand on her. I was just protecting myself. And then she came back and she would apologize. And pretty soon it got to the point where she was doing it without apologizing. So she was getting used to, you know, that type of activity.

Q. So you continued to live with a woman you say was abusive to you?

A. Right.

Q. What happened, the incident that led to her driving the car out into Morris Boulevard?

6

A. Okay. We had gone to church that day . . . . And we went to pick up something to eat. We normally try to pick up chicken or some other something and take it over to my parents' house on Sunday. That's usually their day. And we went by to get it at Bojangles. Every time in the past year I had been paying for everything and we pulled up to the window and I said, "Honey go ahead and take care of this, okay?" And she said, "Well I'm not going to pay for it."

Q. Was she driving?

A. She was driving. And she was at the window. Well they got the stuff together and she drove out. She left the chicken place. We pulled into the parking lot at the office and she started. I said, "Boys come on let's get out." I said, "I'm going to have to take you and get you something to eat."

Q. Oh she didn't buy the food?

* * *

A. No she drove off leaving it there in the window. And then she started screaming and ranting and raving and the kids were in the backseat . . . and I said, "Come on boys." I said, "Let's go." Well as I stepped out of the car I had the door open and she put it in reverse and mashed on the gas. Well as she did that door knocked me down and [the car] ran over my foot. Well I pulled myself . . . was able to pull myself back and get up into the car and she was screaming and carrying on and she'd pulled out in the middle of Morris Boulevard . . . . I said, "You're going to have to get this car out of the road." I said, "People's going to come up here and they're going to hit us and could possibly kill us and the children that's in the backseat." She was actually blocking the lane of traffic. And so I put my foot over the console, put the foot on the brake, put the car in reverse, mashed on the gas, backed it up, put it back in park, turned it off and pulled the key out. And the exchange where she got her lip hit there in the middle of it was in the parking lot before we pulled out into the . . . into the traffic ….

Q. What happened?

***

Q. If you didn't hit her lip what happened?

7

A. Well she . . . when she was screaming . . . when she quit screaming she just kind of looked then and then I got the boys out and took them into the clinic and then she got out and called her mother and then her mother came and she said, "This doesn't need to be going on in front of these boys." Well it didn't need to be going on period. But that . . . that was the incident. But then two or three . . . I don't know how much longer, a few weeks, or so, I don't know exactly the time period but I got a call from my probation officer and the probation officer says, "I understand that there's been a domestic violence . . . that you . . . that somebody had seen you smack your wife in front of the . . . or punch your wife . . . in the middle of Morris Boulevard." I said, "That's not true." I explained to [probation officer] what had happened and that she ran over my foot and ran over me in the parking lot and I got back in and in the altercation she got hit in the lip." And . . . well she says, "I'm going to recommend that you have counseling." And I said, "Well that may be a blessing in disguise . . . ." I said, "Our marriage really needs to have it."

***

Q. Have there been other incidences where for no reason apparent to you that your wife went off into dramatic fits?

A. Yes.

***

A. And there was one situation that she went off and . . . and see that was in January. And then we had a good period of time in the spring but then she started getting jealous over another . . . a girl that was working for me. And it wasn't but like an 18 year old girl. And she said, "Well you took her out and . . . ." See sometimes I have to go out and pull blood on horses for Kargans testing. So I'll take out a secretary or one of the girls and they'll fill out the paperwork while I actually do the vaccinating and pulling the blood. And then we'll go back to the . . . back to the office and get it ready for the lab. And she says, "Well I understand you took out . . . you went out and . . . it doesn't look good for you to be taking a girl out with you on a call." And I said, "Listen, if I wanted to have anything to do with another girl I would have . . . I wouldn't have married you. I could have done it a long time ago." I said, "I don't know why you don't have the confidence and security in me but . . . ." [A]nyway, that was one of the situations . . . .

8

Wife and her mother alleged injuries to the children during the time that they were under the supervision of Husband or Husband's family members acting as caretakers. When Husband worked, the children were cared for by his family or taken to the clinic where he and his staff watched them. Wife further alleged that Husband's sister had abused the oldest son by hitting him with a switch. During questioning about her abuse allegations toward the children, Wife testified:

> A. Yeah. I mean, it's like when they've come home it's like they're constant . . . there's constant injuries and then like the motorcycle burn and John Mark had bruises on his back too from falling off the pony. (Witness paused)
>
> Court: Well that's pretty normal boy stuff I think, you know, based on my experience. So, you know, if you've got some evidence that somebody's abusing them or anything, you know then . . . and I'm talking more than just giving them a good whipping. I'm talking about some sort of abuse. I'll listen to it.

The trial court noted in August 2017 how difficult the course of the case had been:

> Look this is the biggest mess I've ever seen in my life. It's a terrible mess and the two of you all are going to come out of this and be about the same way you were before but you've got these two little boys and they are going to be the casualties of this war you're fighting.

In a final judgment rendered on December 7, 2017, the trial court ordered the parties divorced and approved a parenting plan that granted the parties equal co-parenting time with joint decision making and Husband as the primary residential parent. The trial court awarded Wife all of her interest in her 401(k) and her personal bank account. She was allowed to retain the $9,700 in cash of Husband's property and was awarded all interest in her personal property listed. Husband was awarded all interest in the marital residence, his IRA, his business account, personal accounts, livestock, and an antique car. Husband was held solely responsible for the line of credit. Additionally, he was awarded as his sole property the remaining real property, personal property, and farm equipment. Husband continued to live at the Needmore Road property, which was awarded to Husband as his separate property, although the court did award Wife $25,000 for her share of the increased value as a result of improvements. In the trial court's memorandum opinion, the court "believe[d] that the increase in value or the increase to the marital estate during the marriage on the marital home is the equivalent of one hundred thousand dollars ($100,000.00)." "The court found that 'the Wife's share of the cattle is twenty-five thousand dollars ($25,000.00)." The court opined that he believed he was awarding Wife a bit more than 50% of the marital estate:

> I find that it's just a wash. There were some things accrued or increased during the marriage but they were sort of accrued on both sides so the Court doesn't believe that it would be equitable

9

for any money to change hands. The Court's calling it a wash. And that favors the Wife because she gets to retain her sizable 401K.

***

I believe, the way I think about the numbers, that I have favored the Mother a little bit in the number and it's probably not up to sixty forty (60/40) but it's more that she gets more than fifty percent (50%) I guess of whatever accrued during the marriage because I'm just knocking her whole retirement fund off to her. But if you look at it and you become convinced that I've given her less than fifty percent some way or other then bring it back before the court in a Motion if you don't mind and let me at least hear what you're thinking, okay.

As to the parenting plan, the court observed that it was "troubled . . . because nothing I try to do for you guys seems to work." The court continued:

I think Mom there's a lot of testimony from friends of yours and insinuating on the record that you were planning on moving somewhere. And if that's what is best for you . . . the Court absolutely is not telling someone they can or cannot move. The father is anchored. I know the kids will have a roof over their head there. And for that reason the Court is choosing to make the Father the primarily residential parent. But the main reason I'm doing that is because of this indication that you may move . . . .

But I am going to try to split the time with you two as close to equal as I can get.

***

Mr. Stambaugh: . . . [A]re we talking a four/three (4/3), three/four (3/4) that would alternate a fifty/fifty (50/50) schedule like Nan Buturff suggested in her testimony?

Court: Yeah that's what I want to do. Yeah.

***

Court: . . . I'm making the Father the primary custodian because if she decides to move somewhere I want her to have to give him the notice and I want the case to have to come back before me and me hear it again. . . . But she testified from the witness stand that she

10

had no immediate plans to go anywhere although maybe in her heart of hearts she'd like to . . . .

After the court's ruling, Wife timely filed her appeal.

## II. ISSUES

The following issues are raised by Wife in this appeal:

A. The trial court erred in declaring the parties divorced pursuant to Tennessee Code Annotated section 36-4-129(a), as the parties did not jointly stipulate to grounds to divorce.

B. The trial court erred in approving and ordering Husband's permanent parenting plan providing equal parenting time.

    (1) The trial court erred in failing to make specific findings of fact as to the statutory factors in Tennessee Code Annotated section 36-6-106(a).

    (2) The trial court erred in not limiting Husband' parenting time for domestic violence under Tennessee Code Annotated section 36-6-406(a)(2).

    (3) The trial court erred in designating Husband primary residential parent under Tennessee Code Annotated section 36-6-406(a)(2).

    (4) The trial court erred in ordering that (1) the parents find a "Christian counselor" for the children and requiring that (2) the children remain in Wednesday night church activities at First Baptist Church.

C. The trial court erred in its classification valuation, and division of the parties' marital property.

    (1) The trial court erred in failing to consider the factors listed in Tennessee Code Annotated section 36-4-121(c) in making its equitable division of marital property.

    (2) The trial court erred in its calculation of Wife's share of the marital estate.

D. Is Wife entitled to attorney's fees and litigation expenses on appeal.

11

### III. STANDARD OF REVIEW

This case was tried without a jury. We review the findings of fact made by the trial court de novo, with a presumption of correctness unless the preponderance of the evidence is to the contrary. Tenn. R. App. P. 13(d); *In re C.K.G.,* 173 S.W.3d 714, 731 (Tenn. 2005). The trial court's conclusions of law, however, are reviewed de novo and "are accorded no presumption of correctness." *Brunswick Acceptance Co., LLC v. MEJ, LLC*, 292 S.W.3d 638, 642 (Tenn. 2008).

Parenting and visitation arrangements are recognized as "among the most important decisions confronting a trial court in a divorce case." *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006). In making such decisions, the needs of the child are paramount, and the desires of the parent are secondary. *Id.* While trial courts have broad discretion to make parenting decisions, their determinations must be made based upon proof and applicable principles of law. *Id.* Given the discretion involved and the fact that the decision often hinges on witness credibility, our court has stated that "appellate courts are loathe to second-guess a trial court's conclusion." *Id.*

In a case involving the proper classification and distribution of assets incident to a divorce, the Tennessee Supreme Court has elucidated the applicable standard of appellate review as follows:

> Th[e] Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

*Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007). Questions relating to the classification of assets as marital or separate are questions of fact. *Bilyeu v. Bilyeu*, 196 S.W.3d 131, 135 (Tenn. Ct. App. 2005).

> Because Tennessee is a "dual property" state, a trial court must identify all of the assets possessed by the divorcing parties as either separate property or marital property before equitably dividing the marital estate. Separate property is not subject to division. In contrast, Tenn. Code Ann. § 36-4-121(c) outlines the relevant factors that a court must consider when equitably dividing the marital property without regard to fault on the part of either party. An equitable division of marital property is not necessarily an equal division, and § 36-4-121(a)(1) only requires an *equitable* division.

*McHugh v. McHugh*, No. E2009-01391-COA-R3-CV, 2010 WL 1526140, at *3 (Tenn. Ct. App. Apr. 16, 2010) (internal citations omitted). *See Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001) (holding that appellate courts reviewing a distribution of marital property "ordinarily defer to the trial judge's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence.").

## IV. DISCUSSION

### A.

Tennessee Code Annotated section 36-4-129 provides:

> (a) In all actions for divorce from the bonds of matrimony or legal separation the parties may stipulate as to grounds and/or defenses.
>
> (b) The court may, upon stipulation to or proof of any ground for divorce pursuant to §36-4-101, grant a divorce to the party who was less at fault or, if either or both parties are entitled to a divorce, declare the parties to be divorced, rather than awarding a divorce to either party alone.

At the final hearing, the trial court stated: "I've heard enough already to know that there's probably fault on both sides. I'd be inclined to declare them divorced pursuant to 36-4-129(b), which is a statute that says if I hear fault on both sides I can just declare them divorced. So I'd be inclined to do that." In the findings of the court, it declared the parties divorced pursuant to section 36-4-129(b), finding fault on both sides. It appears that the written final judgment of divorce, prepared by counsel, contains an error reciting the incorrect subsection of the statute as (a) instead of (b). Party-prepared orders "must accurately reflect the decision of the trial court." *Smith v. UHS of Lakeside*, 439 S.W.3d 303, 316 (Tenn. 2014). In order to represent

the trial court's decision, the final judgment of divorce shall be corrected to reflect that the divorce was granted pursuant to Tennessee Code Annotated section 36-4-129(b).

**B.**

In any action for divorce where parenting or custody is at issue, the courts must include in the final decree a permanent parenting plan that designates one parent as the "primary residential parent." Tenn. Code Ann. § 36-6-404. *See Hopkins v. Hopkins*, 152 S.W.3d 447, 449 (Tenn. 2004). The permanent parenting plan must include a residential schedule, which is defined in section 36-6-402(3) as "a written plan for the parenting and best interests of the child, including the allocation of parenting responsibilities and the establishment of a Residential Schedule." The residential schedule "shall designate in which parent's home each minor child will reside on given days of the year. . . ." Tenn. Code Ann. § 36-6-402(5).

A trial court's determination of a post-divorce parenting plan for a minor child must be made upon the basis of the best interest of the child. Tenn. Code Ann. § 36-6-401. The determination is not intended to either reward or to punish parents, *Earls v. Earls*, 42 S.W.3d 877, 885 (Tenn. Ct. App. 2000), but rather to place the child in an environment that will best serve its physical and emotional needs. *Luke v. Luke*, 651 S.W2d 219, 221 (Tenn. 1983).

"Trial courts have broad discretion in devising permanent parenting plans and designating the primary residential parent." *Burton v. Burton*, No. E2007-02904-COA-R3-CV, 2009 WL 302301, at *2 (Tenn. Ct. App. Feb. 9, 2009). However, those determinations must be made based on proof and applicable principles of law. *Chaffin*, 211 S.W.3d at 286. This court reviews such determinations under an abuse of discretion standard. *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999). A trial court abuses its discretion when it fails to consider the applicable law and relevant facts in reaching its decision. *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008). An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). A court also is said to abuse its discretion "when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93 (Tenn. 2013) (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001)).

Wife argues that the trial court erred in approving Husband's proposed permanent parenting plan providing equal parenting time, erred in failing to make specific findings of fact as to the statutory factors listed in 36-6-106(a), erred in not limiting Husband's parenting time under 36-6-406(a)(2), and erred in designating Husband as primary residential parent.

Husband contends that the court did not approve Husband's plan but rather created its own plan. He argues that the record is totally devoid of any proposed parenting plan filed by Wife, despite Local Rule 28.05 and Tennessee Code Annotated section 36-6-404 requiring that each party shall file and serve a proposed parenting plan. Husband thus argues that Wife cannot

14

now complain about issues she waived in the trial court by failing to submit a proposed permanent parenting plan. Additionally, he contends that Wife agreed before the court to the parenting arrangement which the court ultimately ordered. *See O'Rourke v. O'Rourke*, No. M2007-01833-COA-R3-CV, 2010 WL 4629035 (Tenn. Ct. App. Nov. 10, 2010).

Wife admitted that she did not file a proposed permanent parenting plan. Further, she asserted that she did not want Husband's parenting time restricted or supervised:

> Q. Do you still want [Husband]'s parenting time restricted or supervised"
> A. I wouldn't say that.
> Q. Okay. What would you say?
> A. (Witness paused). I would say that if it's [Husband]'s parenting time then [Husband] should be using his time to parent his children.

As noted in *Jacobsen v. Jacobsen*, No. M2012-01845-COA-R3-CV, 2013 WL 1400618,

> "There are currently two different statutes setting out non-exclusive lists of factors for the trial court to apply to help it reach the goal of determining a child's best interest." *Thompson v. Thompson*, No. M2011-02438-COA-R3-CV, 2012 WL 5266319, at *6 (Tenn. Ct. App. Oct. 24, 2012). Tennessee Code Annotated § 36-6-106, which applies to custody determinations, and Tennessee Code Annotated § 36-6-404, which governs the establishment of permanent parenting plans. *See Burden[v. Burden]*, 250 S.W.3d 899, ] 908 [(Tenn. Ct. App. 2007)]; *see also Thompson*, 2012 WL 5266319, at *6. . . . The list of factors contained in [the two statutes] are "substantially similar" and both permit the court to allow for consideration of any other factors that the court deems relevant. *Thompson*, 2012 WL 5266319, at *6. Thus, in most cases, the analysis and result would be the same regardless of which set of factors is applied. *Id.*

*Id.* at *4.

The factors to be considered in adopting a permanent parenting plan, as set out in Tennessee Code Annotated section 36-6-404(b), are:

> (1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult;
>
> (2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken

15

greater responsibility for performing parenting responsibilities relating to the daily needs of the child;

(3)  The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;

(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of the parent's lack of good faith in these proceedings;

(5)  The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(6)  The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(7)  The love, affection, and emotional ties existing between each parent and the child;

(8)  The emotional needs and developmental level of the child;

(9)  The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

(10)  The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(11)  The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12)  Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13)  The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14)  The reasonable preference of the child if twelve (12) years of age or older. . . .

(15)  Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(16)  Any other factors deemed relevant by the court.

Wife cites Tennessee Code Annotated section 36-6-106(a) as the source of the statutory factors that the trial court is obligated to consider.  As noted above, those factors are similar, but not quite identical, to the statutory factors set out in section 36-6-404 for the court to consider when creating a parenting plan.  The Tennessee Code Annotated section 36-6-106(a) factors are as follows:

(1)  The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2)  Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.  In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3)  Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4)  The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5)  The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6)  The love, affection, and emotional ties existing between each parent and the child;

(7)  The emotional needs and developmental level of the child;

17

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child . . . ;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person . . . ;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older . . . ;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a). As the court noted in *Port v. Hatton*, No. M2011-01580-COA-R3-CV, 2013 WL 865549 (Tenn. Ct. App. Mar. 6, 2013), "[w]hile the trial court is directed to consider the appropriate factors in reaching its decision, it is not required to list each factor with the court's conclusion about how that factor impacted the custody decision." *Id.* at *6. However, if the court has not set out specific findings of fact incorporating its reasoning about the statutory factors, this court may remand the case to the trial court to make such findings. *Id.*

Wife contends the trial court abused its discretion in designating Husband the primary residential parent when the only factor the court appeared to consider was the possibility that Wife would relocate her residence. Wife claims that this finding was contrary to the evidence of record that Wife had permanent employment as a pharmacy manager, that her family resided in Hamblen County, and that she had no plans to relocate. However, Wife's deposition testimony was introduced at trial, in which she stated that she did not know if she had plans to move the children out of Hamblen County, that she has thought about it, that she has told people she plans to move the children, and that she will if allowed. She testified she could work anywhere Walgreen's had a store and that she wanted to "get on with my life and not have people constantly . . . (witness paused) . . . having to deal with issues." Husband responds that Wife's testimony was both contradictory and evasive about her plans to relocate with the children.

18

Wife further asserts that the trial court erred in not limiting Husband's parenting time for domestic violence under Tennessee Code Annotated section 36-6-406(a)(2), which provides as follows:

> (a) … a parent's residential time as provided in the permanent parenting plan or temporary parenting plan <u>shall be limited</u> if it is determined by the court, based upon a prior order or other reliable evidence, that a parent has engaged in any of the following conduct: . . . . (2) Physical or sexual abuse or a pattern of emotional abuse of the parent, child or of another person living with that child as defined in § 36-6-601.

The trial court's duty to limit residential time for the abusing parent is mandatory under Tennessee law. *See Carr v. Carr,* No. M2017-00556-COA-R3-CV, 2018 WL 1137109, at *6 (Tenn. Ct. App. Mar. 1, 2018). *See Burden,* 250 S.W.3d at 913.

Husband contends that the issues Wife raises now on appeal are contrary to the direct agreement she stated at trial on October 6, 2017, which the trial court "blessed" on the second day of trial:

> Mr. Stambaugh: Your Honor I think we're in agreement that we . . . that it will be a joint custodial situation with fifty/fifty (50/50) time between the parents.
>
> Court: Okay.
>
> Mr. Stambaugh: It's just a matter of trying to get the Plan down to where she can have some Saturdays and at least some weekend time.
>
> Court: I'm supportive of that.
>
> Mr. Stambaugh: We're working on that four/three/four split.
>
> ***
>
> Court: You want some weekend time?
>
> Mrs. Mangum: (Nodding affirmatively)
>
> Court: You want some weekend time?
>
> Mr. Mangum: Yes.
>
> Court: But you work a Saturday. I mean, I think I've been hearing that . . . .

Mr. Mangum: It's . . . it's . . . it's flexible, my work on Saturdays.

Court: Well why don't you start out with every other weekend and then add enough days in the off-week to make it fifty/fifty. And then Ms. Nan Buturff, who I like by the way, I mean, I don't necessarily disagree with … or I mean, agree with her on the whipping part but I really like her and I think she's a good decent human being. You know, she's … I think she's got good intentions and I think she wants these kids to be happy and flourish. So I like her. But anyway, she seemed to think that any more than four (4) days was a problem. But if we need to put a … like a five (5) day block every other week or something in there just to get this done fifty/fifty, are you good with that? I mean, can you live with that?

Mr. Mangum: Yes sir I am.

Court: And that's to both of you. I'm asking both of you.

Mrs. Mangum: (No response)

Court: What about you ma'am?

Mrs. Mangum: Yes.

The Court then stated: "Alright. Well I appreciate you all working it out. I mean, you all are the parents of these kids and you know what's best. And I'm going to bless the agreement."

Husband further argues that Wife's pleadings do not allege spousal abuse and do not request that Husband's parenting be restricted and limited because of abuse. Husband also asserts that Wife's factual accounts and allegations are inconsistent as well. He states that her behavior throughout the marriage and during the litigation are inconsistent with the way a victim would have reacted. He contends that Wife never made any reports of abuse to anyone, including her psychiatrist, did not call the police, and did not seek an order of protection until the divorce was filed. She dismissed her petition for an order of protection against Husband shortly after filing it.

Wife contends that Husband stipulated to the United States District Court for the Eastern District of Tennessee that he had physically abused her. Because hitting Wife was a violation of Husband's federal probation, to avoid having it revoked, he filed a document in which he stipulated to "slapping" Wife in the presence of the children. As a condition of the terms of his probation, he was required to participate in domestic violence counseling.

In *O'Rourke v. O'Rourke*, No. M2007-01833-COA-R3-CV, 2010 WL 4629035 (Tenn. Ct. App. Nov. 10, 2010), it was argued that the mother had waived the abuse issue. We observed in *O'Rourke*,

> Mother would like us to read Tenn. Code Ann. § 36-6-406 as absolutely barring any parent from being named as the primary residential parent of a child if that parent has any history of abuse, no matter the degree of abuse involved or its remoteness in time. Both the legislature and the courts take domestic abuse very seriously, as they should. We do not believe, however, that the legislature intended the statute to be applied so broadly as to deprive the trial court of its discretion to make with the best interest of the children, based upon the factual situation that exists at the time of that determination.

2010 WL 4629035, at *15. We found that the mother waived the issue of the application of 36-6-406 because she had repeatedly entered into parenting plans <u>following</u> the divorce permitting the father to share custody. *Id.* at *15. The court further noted that the mother made no assertion of abuse following the filing of the divorce complaint. *Id.*

The appeal before us is an appeal from an initial determination of the primary residential parent in which there was testimony at trial regarding the alleged abusive behavior. Thus, this case is not like *O'Rourke* where the mother attempted to apply the statute many years after the divorce. We must address whether the trial court erred in failing to apply the statute.

The trial court is required to consider evidence of physical or emotional abuse against the other parent in determining the custody and parenting schedule for the children. *Burden*, 250 S.W.3d at 913. Although the trial court is entitled to make credibility determinations based on its observations in the courtroom:

> [T]he court cannot simply disregard the weight of the evidence of a substantive issue on the basis of nothing more than its own conclusory statements regarding a party's character. Whether or not the court believes [the father] is "totally harmless" and "gentle," it is still required to duly consider the evidence that he committed abuse of the sort that would affect the outcome of the case under §§ 36-6-406(a), 36-6-106(a) and 36-6-404(b).

*Id.* at 914.

As noted by Wife, in naming Husband primary residential parent, the only factor that the trial court appeared to consider was the stable environment offered by Husband in the marital home. The court did not enumerate or discuss the statutory factors as to the education, character, and experience of the parents, their economic circumstances and employment schedules, and their conduct. There is no discussion of the "best interests of the children." The trial court did not mention or discuss the children's ages, habits, mental and emotional make up; the relative

location of the parents' residences; the relationships between the children, caregivers, and family members; or the relationships between the parents and children. It made virtually no findings of fact regarding the abuse allegations but designated Husband as the primary residential parent. We must remand for the court to make appropriate findings as to the abuse issue in addition to all other relevant and appropriate statutory factors. Consistent with our standard of review, this is a determination more appropriately made by the trial court. All other matters raised related to the permanent parenting plan are pretermitted.

## C.

Wife asserts that the trial court erred in the classification, valuation, and division of marital assets. She contends that the trial court failed to make sufficient findings of fact regarding the statutory factors for the equitable division of marital property.

When equitably distributing the marital property, the trial court must first identify all property interests at issue in the divorce proceeding. *See Keyt,* 244 S.W.3d at 328. After identifying the property interests, the trial should then classify the property as either marital or separate property. *Id.* It is well settled that a trial court must identify all assets of the parties in divorce proceedings as either separate or marital property prior to equitably distributing the marital property. *Id.* The courts do not have the authority to make a distribution of separate property, so the classification of the property is an important threshold matter. *Id.* So classification determinations present questions of fact. *Woodward v. Woodward*, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007). Accordingly, a trial court's classification of property as either separate or marital will not be disturbed unless it is not supported by a preponderance of the evidence. *Id.*

Tennessee Code Annotated section 36-4-121(b)(1) (2017) defines marital property as follows:

> (A) "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce ….
>
> (B)(i) "Marital property" includes income from, and any increase in the value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party *substantially contributed* to its preservation and appreciation;
>
> (ii) "Marital property" includes the value of vested and unvested pension benefits, vested and unvested stock option rights, retirement, and other fringe benefit rights accrued as a result of employment during the marriage;

22

(iii) The account balance, accrued benefit, or other value of vested and unvested pension benefits, vested and unvested stock option rights, retirement, and other fringe benefits accrued as a result of employment prior to the marriage, together with the appreciation of the value, shall be "separate property." In determining appreciation for purposes of this subdivision (b)(1)(B)(iii), the court shall utilize any reasonable method of accounting to attribute post marital appreciation to the value of the premarital benefits, even though contributions have been made to the account or accounts during the marriage, and even though the contributions have appreciated in value during the marriage; provided, however, the contributions made during the marriage, if made as a result of employment during the marriage and the appreciation attributable to these contributions, would be "marital property." When determining appreciation pursuant to this subdivision (b)(1)(B)(iii), the concepts of comingling and transmutation shall not apply.

(iv) Any withdrawals from assets described in subdivision (b)(1)(B)(iii) used to acquire separate assets of the employee spouse shall be deemed to have come from the separate portion of the account, up to the total of the separate portion. Any withdrawals from assets described in subdivision (b)(1)(B)(iii) used to acquire marital assets shall be deemed to have come from the marital portion of the account, up to the total of the marital portion;

Tenn. Code Ann. § 36-4-121(b)(1)(A), (B) (emphasis added.)

"Separate property," on the other hand means:

(A) All real and personal property owned by a spouse before marriage, including, but not limited to, assets held in individual retirement accounts (IRAs) as that term is defined in the Internal Revenue Code of 1986 (26 U.S.C.), 1 as amended;

(B) Property acquired in exchange for property acquired before the marriage;

(C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1);

(D) Property acquired by a spouse at any time by gift, bequest, devise or descent; …

Tenn. Code Ann. § 36-4-121(b)(2)(A)-(D) (2017).

The Tennessee Supreme Court has previously determined that the appreciation of a retirement account funded during the marriage is deferred compensation and is marital property subject to division during divorce. *See Langschmidt,* 81 S.W.3d at 749 ("Retirement benefits accrued during the marriage clearly are marital property under Tennessee law."). However, our Supreme Court also held in *Langschmidt* that "the appreciation of a spouse's IRA during the marriage is separate property when funded completely with premarital earnings and absent substantial contribution by the other spouse to the preservation and appreciation of the IRA." *Id.* at 742. The Supreme Court thereafter clarified its previous holding in *Langschmidt* and emphasized that the IRAs at issue in *Langschmidt* were not a product of the spouse's employment, did not involve deferred compensation, and had been funded entirely by premarital funds. *Snodgrass v. Snodgrass*, S.W.3d 240, 255 (Tenn. 2009). The Court in *Snodgrass* further held "that 401(k) accounts held through a spouse's employer are 'retirement or other fringe benefit rights relating to employment.'" *Id.*

"Once the parties' marital property has been classified and valued, the trial court's goal is to divide the marital property in an essentially equitable manner." *Owens v. Owens*, 241 S.W.3d 478, 489-90 (Tenn. Ct. App. 2007) (citing Tenn. Code Ann. § 36-4-121(a)(i)). "A division of marital property is not rendered inequitable simply because it is not precisely equal, or because each party did not receive a share of every piece of marital property." *Id.* at 490. "The approach to dividing a marital estate should not be mechanical, but rather should entail carefully weighing the relevant factors in Tenn. Code Ann. 36-4-121(c) in light of the evidence that the parties have presented." *Id.* "Trial courts have broad discretion in fashioning an equitable division of marital property, and appellate courts must accord great weight to a trial court's division of the marital property." *Id.*

In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the

24

contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c).

It is apparent to this court that the trial court struggled mightily with these parties and the case. In the absence of sufficient fact findings reflecting the property valuations, it is difficult for us to discern the rationale behind the property division and whether it is equitable. During the reconsideration of this case, the trial court is further directed to make specific fact findings as to the property issues pursuant to the factors listed in 36-4-121(c).

**D.**

Wife seeks an award of attorney fees and costs for this appeal. Litigants are generally required to pay their own attorney fees unless a statute or contract provision provides otherwise. *John Kohl & Co., P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998). An award of attorney fees is appropriate in a domestic relations case in the following circumstances: "(1) awards to economically disadvantaged spouses as additional spousal support in divorce proceedings; (2) awards to spouses who must return to court to enforce child support obligations; and (3) awards to spouses seeking to enforce an MDA when the MDA contains a provision for attorney's fees." *Elliott v. Elliott*, 149 S.W.3d 77, 88 (Tenn. Ct. App. 2004) (footnotes excluded). When an appellate court considers a request for appellate attorney fees, the court

25

considers "the requesting party's ability to pay, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other relevant equitable factors." *Culbertson v. Culbertson*, 455 S.W.3d 107, 158 (Tenn. Ct. App. 2014) (citing *Moran v. Willensky*, 339 S.W.3d 651, 666 (Tenn. Ct. App. 2010)). A decision to award attorney fees on appeal is within the "sound discretion" of the appellate court. *Luplow v. Luplow*, 450 S.W.3d 105, 120 (Tenn. Ct. App. 2014).

Husband asserts that this appeal is frivolous and not in good faith. Accordingly, he seeks an award of his attorney's fees and costs from both Wife and Amici Curiae under Tennessee Code Annotated section 27-1-122, which allows for an award of attorney's fees when an appeal is frivolous or taken solely for delay.

Despite the fact that we do not find Wife to be entitled to an award of attorney fees for this appeal, we do not agree with Husband that the appeal by Wife was frivolous and not in good faith. Taking all the relevant factors into account, we decline to award attorney fees on appeal to either party.

## V. CONCLUSION

For the foregoing reasons, we vacate the trial court's judgment except as to the divorce. This case is remanded for the trial court to make appropriate findings of fact and conclusions of law that consider all the relevant and applicable statutory factors.

_____
JOHN W. MCCLARTY, JUDGE

26